IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BENJAMIN SHABAZZ PEAY | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.04-C-1859 (CKK) |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| JUSTICE, ET AL, | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)     I am currently the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), at Federal Bureau of Investigation Headquarters ("FBIHQ") in Washington, D.C.  I have held this position since August 1, 2002. Prior to joining the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law.  In that capacity, I had direct oversight over Freedom of Information ("FOIA") policy, procedures, appeals, and litigation for the Navy.  From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate, serving at various commands and routinely working with FOIA matters.

(2)     In my current capacity as Section Chief, I supervise the Freedom of Information/Privacy Acts Litigation Support Unit ("LSU").  The statements contained in this

-1-

declaration are based upon my personal knowledge, upon information provided to me in my

official capacity, and upon conclusions and determinations reached and made in accordance

therewith.

(3)      Due to the nature of my official duties, I am familiar with the procedures followed

by the FBI in responding to requests for information from its files pursuant to the provisions of

the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C.

§ 552a.  Specifically, I am aware of the treatment which has been afforded the FOIA/Privacy Act

request of plaintiff Benjamin Shabazz Peay.  Plaintiff's FOIA request seeks access to records

pertaining to himself.

(4)      The purpose of this declaration is to provide the Court and plaintiff with an

overview of the FBI's RIDS, and an explanation for the limited delay associated with the FBI's

processing of documents responsive to plaintiff's FOIA request.  For the reasons which will be

discussed below in greater detail, the FBI is submitting this declaration in support of a stay of

proceedings for twenty five (25) months, until February 28, 2007, in order to allow the FBI to

complete the processing and release of documents responsive to plaintiff's request.  If the

plaintiff accepts the offer of the FBI's Negotiation Team to narrow the scope of his request, the

amount of time needed to complete processing plaintiff's request will be greatly reduced.

## OVERVIEW OF THE FBI'S FOIA/PRIVACY ACT BACKLOG

(5)      The number of FOIA and Privacy Act requests received by the FBI has increased

dramatically since the early 1980s.  At that time, the FOIA Section had sufficient resources to

process and administratively maintain a balanced flow of work, which kept the growth in the

backlog to a minimum. However, from the mid-1980s until 1996, the unavailability of additional

employees and a steady, large stream of new requests increased the backlog substantially. The

number of FOIA and Privacy Act requests on hand at FBIHQ, in various stages of processing,

increased from its 1985 level of 4,736 to a total of 16,244 requests in December 1996.

(6)     In the past, the backlog in the FOIA Section has been exacerbated by the high

volume of administrative appeals which require review and response by the FBI's FOIA Section

personnel. RIDS personnel work closely with the staff of the U.S. Department of Justice, Office

of Information and Privacy ("OIP") staff in reviewing and assisting with OIP's responses and

determinations of pending appeals. During Fiscal Year FY 2004, and the first quarter of FY

2005, the FBI received a total of 2,119 administrative appeals. As of January 19, 2005, 630

administrative appeals were pending resolution. Inevitably, the time spent by FOIA personnel

handling these appeals reduces the amount of time for regular processing duties.

(7)     At the present time, the FBI is involved in over 145 pending lawsuits in various

federal district and appellate courts throughout the United States. As a result, there have been

substantial litigation demands placed upon RIDS in the past several years. These lawsuits

require a substantial time commitment by various RIDS personnel. At times, specific cases

require the devotion of an inordinate amount of personnel and resources. For instance, from

February 1997 until the Spring of 2000, Whitehurst v. FBI, Civ. A. No. 96-572 (D.D.C.) (GK),

required the full-time assignment of between six (6) to twenty-five (25) Legal Administrative

Specialists ("LASs") who, pursuant to both a court order and a subsequent settlement agreement,

processed approximately 272,112 pages. Even today, LASs continue to work on requests

stemming from this litigation and settlement agreement. More recently, litigation deadlines in

Konigsberg v. DOJ, Civ. A. No. 02-CV-2428 (ESH) (D.D.C.), required the full-time assignment

of approximately 30 LASs, who processed over 24,000 pages in three (3) months.

(8)     More recently, several urgent and competing litigation deadlines have necessitated

shifts in RIDS' personnel resources.  For example, Judge Susan Illston issued a September 16,

2004 Memorandum Opinion and Order in Steven Homick v. DOJ, Civ. A. No. C-98-00557SI

(N.D. Cal.), denying in part the FBI's motion for summary judgment, and ordering the FBI to

reprocess and release approximately 12,000 pages of documents by October 15, 2004.  In order to

comply with Judge Illston's deadline, RIDS paralegals were shifted to assist the FOIPA

Litigation Support Unit to assist in the FBI's efforts to move for reconsideration of the

September 16, 2004 Order and to seek relief from the October 15, 2004 deadline, which were

mostly unavailing.  As a result, the FBI has had to continue its task of reprocessing the

approximately 12,000 pages and meet the court-imposed deadlines.  RIDS personnel also had to

be shifted to assist the FOIPA LSU to comply with Judge Charles R. Breyer's June 15, 2004

Memorandum Opinion and Order in ACLU, et al. v. TSA, et al., Civ. A. No. C-03-1779 CRB

(N.D. Cal.).  The June 15, 2004 Order required the FBI to carefully re-review and reprocess

documents related to the Transportation Security Administration's ("TSA") "no fly" and

"selectee" lists, produce a reprocessed set of documents, and a revised Vaughn declaration in

excess of 150 pages.  Moreover, on September 15, 2004, Judge Alvin K. Hellerstein presiding

over ACLU, et al. v. DOD, et al., Civ. A. No. 04-4151 (S.D. N.Y.), ordered the FBI by October

1, 2004 (interim deadline) and October 15, 2004 (final deadline) to either produce or identify and

-4-

Vaughn all documents responsive to plaintiffs' FOIA requests concerning the treatment, deaths

and rendition/repatriation of any individuals apprehended after September 11, 2001 who are

currently being held, or were formerly held in United States custody at military bases or detention

at facilities outside of the United States. This September 15, 2004 Order has resulted in

numerous RIDS employees being diverted to review and process thousands of potentially

responsive pages, and to draft the necessary Vaughn declaration. Five additional FOIA LASs

were shifted within RIDS to assist the FOIPA LSU with this litigation. Over time, it is not

surprising that this diversion of personnel resources in multiple litigations has had a significant

impact on the FBI's FOIA backlog, as well as a delaying effect on requests assigned to and being

processed by those LASs.

(9)    The events of September 11, 2001, have had an indelible and lasting impact not

only on our nation, but on the FBI in particular. After September 11, 2001, it was clear that the

FBI needed to change from an agency primarily focused on bringing criminals to justice to one

whose primary focus is the prevention of future attacks. In the wake of 9/11/01, the FBI

launched the largest, most comprehensive investigation in its history ("PENTTBOM") in order to

identify the killers of September 11 and to prevent further terrorist attacks. Thousands of FBI

agents and intelligence analysts continue to be actively engaged with their federal, state, local and

international counterparts in an unprecedented worldwide effort to detect, disrupt, and dismantle

terrorist organizations. In furtherance of this unprecedented investigation, the FBI has shifted

and refocused many of its priorities and resources. This  resulted in the detailing of numerous

LASs in RIDS (often for indeterminate periods of time) to the operational divisions within

FBIHQ working in support of the war on terrorism. Some of these individuals are still on detail or have been permanently transferred to operational divisions.

(10)   In the past, the FBI had repeatedly sought additional funding for the creation of new FOIPA positions. For example, Congress appropriated funds in the 1997 fiscal budget providing for 129 additional employees, and in the 1998 fiscal budget, providing for 239 additional employees. However, following 9/11/01, the number of RIDS personnel has been reduced significantly due to the vital need to have FBIHQ personnel redirected towards the goal of fighting the war on terrorism. Nevertheless, despite this necessary shift in personnel resources, the FBI continues to make great strides in reducing its backlog. For example, requests in the FOIPA Section in various stages of processing between December 31, 1996 and September 30, 2004 dropped from 16,244 to 1,738, resulting in a reduction of 14,506 requests. As of December 21, 2004, RIDS had 2,310 requests in various stages of processing throughout the Section. Moreover, during this past year, the FBI has received an average of 791 requests per month. The FBI's re-engineering effort, which will be described in more detail below, has successfully reduced the FBI's backlog of requests by approximately 89 percent and it is anticipated that future totals should reflect a continuation of this downward trend.

(11)   In addition, RIDS has taken all available steps to aid in the streamlining of the work and reduction of the FOIA/Privacy Act backlog. These include the use of direct on-line computer searches conducted to locate responsive records, the use of forms which eliminate delays associated with word processing, the formation of specific teams to target backlog issues, the development of alternative methods to handle consultations with other government agencies,

and the formation of the FOIPA LSU, which handles all FOIA/Privacy Act Litigation in RIDS.

(12)    In an attempt to adapt technology to the demands of the FOIA/Privacy Act, RIDS is moving in the direction of paperless processing through its FOIPA Document Processing System ("FDPS"). The FDPS allows the user to scan FBI files, documents, and correspondence, and enables the user to process pages electronically rather than manually. RIDS has begun using this system for all new FOIA and Privacy Act requests. As with any completely new system, unforeseen computer glitches have occurred, but they are continually being addressed and corrected by software specialists.

## HOW A FOIA REQUEST IS PROCESSED IN RIDS

(13)    Over the years, the FOIA Section at FBIHQ has engaged in a continual re-engineering process in an effort to better serve the needs of requesters who seek information from the FBI. In 2002, reorganization of various divisions at FBIHQ resulted in the formation of the Records Management Division, which now handles all FOIA and Privacy Act requests through the Record/Information Dissemination Section. These most recent re-engineering efforts have resulted in the following organizational plan which will be discussed in more detail below.

(14)    The mission of RIDS is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information. RIDS is responsible for providing program and policy management pertaining to the researching, reviewing, analyzing, processing, and classification/declassification work relating to FOIA and Privacy Act, Executive Order 12958, as amended, Presidential, Attorney General, and FBI policies and procedures, judicial decisions, and other Presidential and Congressional directives. RIDS also provides

prepublication review of material written by current and/or former FBI employees concerning

FBI matters as mandated by the FBI's employment agreement. RIDS currently employs 251

employees, most of whom are Legal Administrative Specialists ("LASs"), and who are assigned

among the ten (10) Units within RIDS, whose shared function is to intake, review, process, and

release information in response to FOIA and Privacy Act requests. To accomplish this mission,

RIDS consists of the following ten Units: the Service Request Unit ("SRU"), two Work Process

Units ("WPU"), three Classification Units ("CU"), three Freedom of Information and Privacy

Acts ("FOIPA") Units ("Disclosure Units"), and the Litigation Support Unit ("LSU").

      (a)    The **Service Request Unit** ("SRU") is responsible for reviewing and

sorting all correspondence/incoming requests for information from the public, Congress,

Presidential Libraries, foreign governments, other federal and state agencies, and other FBI

entities (i.e., FBI field offices, Legats). The SRU handles various initial tasks required to

"perfect" a FOIA/Privacy Act request, including sending letters to acknowledge requests,

advising a requester to provide identifying data so that an accurate records search can be made

and/or to submit a notarized signature/Privacy Act waiver, or advising a requester when no

responsive records are located; opens new requests and assigns a FOIPA Request Number; and

enters the perfected requests into the FDPS tracking system. The Negotiation Team, also a part

of SRU, works with requesters whose requests generate a large volume of records in an attempt

to narrow the scope of responsive records and facilitate a more rapid response. Finally, the

Government Response Team ("GRT"), also a part of SRU, provides timely feedback to other

federal agencies and other DOJ components with regard to referrals of documents – either sent

for a consultation or for direct response to the requester – which are either FBI-originated or contain FBI-originated information.[1]

     (b)    The two **Work Process Units** ("WPUs") are responsible for preparing SRU's "perfected" requests for transfer to the three Disclosure Units.  The WPUs conduct searches of the general indices for identifiable records, confirm responsive documents, stamp files for retention, forward files requiring classification review to the three Classification Units, address fee issues (other than fee waiver reviews), retrieve and forward files for scanning into FDPS, respond to status inquiries, handle administrative appeals, and maintain requests prior to their in-turn transfer to the Disclosure Units.

     (c)    The three **Classification Units** ("CUs") are responsible for complying with the classification/declassification review of FBI records under Executive Order 12958, as amended, and the July 1995 DOJ Memorandum of Understanding.  The CUs review documents responsive to FOIA/Privacy Act requests, criminal and civil discovery requests, Congressional and Presidential mandates, Presidential Library requests, mandatory declassification requests, Office of Inspector General Reports, and other federal agency requests in order to determine whether such material should remain classified or be declassified.  In addition, the CUs review and prepare classified material for review by the Department of Justice Review Committee

---

[1] The Government Response Team ("GRT") was formerly known as the "Government Response & Prepublication Review Unit."  However, an internal reorganization recently resulted in shifting the GRT and its functions to the SRU, and shifting the Prepublication Review Team and its functions of prepublication review of all material written by current and/or former FBI employees concerning FBI matters as mandated by the FBI's employment agreement to the RIDS front office.

("DRC").[2]

(d)      The three **FOIPA Units** ("Disclosure Units") perform the actual processing of all records pursuant to the provisions of the FOIA and Privacy Act. "Processing" involves a page-by-page, line-by-line review of the responsive documents to determine which, if any, FOIA and/or Privacy Act exemptions may apply. This includes redaction of the exempt material and notation of the applicable exemption(s) in the margins of each page and/or preparation of deleted page information sheets when pages are withheld in their entireties (now done electronically in FDPS). During the course of their review, the Disclosure Units consult with other government agencies for their determination as to the releasability of their information contained within FBI records, or refer non-FBI documents to those originating agencies for processing and direct response. The Disclosure Units ensure that FOIA and/or Privacy Act exemptions have been applied properly, that no releasable material has been withheld, that no material meriting protection has been released, that all necessary classification reviews have been completed, and that other government agency information and/or entire documents originating with other government agencies have been properly handled.

(e)      The **Litigation Support Unit** ("LSU") is responsible for providing legal support and administrative assistance to the FBI's Office of the General Counsel and Chief Division Counsels and Assistant Division Counsels in the FBI's field offices, in all FOIA/Privacy Act requests that result in federal litigation. The LSU coordinates the progress of the FBI's

---

[2]   The DRC is the FBI's appellate authority with regard to the implementation and administration of Executive Order 12958, as amended, and related directives and guidelines concerning classified information. See 28 C.F.R. § 17.14 (2003).

response to a particular FOIA/Privacy Act request as it progresses through the units described above, coordinates the receipt of substantive litigation-related information from involved FBI Special Agents ("SAs") in the field offices and the operational Divisions at FBIHQ, and coordinates the referral of documents to other DOJ components and government agencies. The LSU prepares the administrative record, drafts both procedural and substantive declarations and court pleadings, codes documents processed by the Disclosure Units, and drafts detailed declarations justifying the assertion of all applicable FOIA/Privacy Act exemptions.

(15)   After SRU and WPU perfect a request, the request is sent to the "perfected backlog." To ensure fairness to all requesters and to equitably administer the deluge of FOIA/Privacy Act requests received by the FBI, a request is assigned based on the date of receipt on a "first in/first out" basis from within each of three queues according to sound administrative practices.[3] The FBI uses a three-queue system as a way to perfect and assign new requests.[4] The three-queue system established "multi-track" processing for requests, based on the amount of time and work involved in handling a particular request.[5] The system nevertheless preserves the principle that, within the three queues, requests are still assigned and processed on a first-in/first out basis. The placement of a request in one of the three queues depends on the total amount of material responsive to that request -- 500 pages or less ("small queue"), 501 to 2,500 pages

-----

[3] See 28 C.F.R. § 16.5 (a) (2003).

[4] This system went into effect on July 10, 1997, superseding the previous system of two queues (one for 100 pages or less, the other for requests greater than 100 pages).

[5] See 5 U.S.C. § 552 (a) (6) (D) (i) and 28 C.F.R. § 16.5 (b) (2001).

("medium queue"), or more than 2,500 pages ("large queue"). This standard operating procedure, coupled with the FBI's "first in/first out" policy, permits requests to be addressed in the order in which they are received, while obviating the inequities to other requesters whose interests relate only to a small number of documents. As described earlier, requesters whose requests have been placed in the large queue are given the opportunity, through contact with SRU's Negotiation Team to reduce the scope of their requests and accelerate assignment of their requests by relocating them to a more advantageous queue.

(16)   LASs frequently work on more than one request at a time because it is not always administratively efficient to work only one request to completion before proceeding to the next. Processing of a complex case may be halted midstream for a variety of reasons, such as resolving a classification issue, locating records that may be missing, or consulting with other government agencies as to the nature and propriety of releasing certain information. In the interest of efficiency during this waiting period, other requests may be processed and released. Therefore, large requests are often processed in conjunction with smaller requests in an attempt to ensure that one requester does not consume a disproportionate share of RIDS resources.

(17)   Consistent with standard administrative procedure, any records which may be referred to the FBI from other DOJ components in response to a particular request may be added to that pending FOIA/Privacy Act request. This process is an equitable way for RIDS to maintain administrative control of FOIA/Privacy Act requests. Under this system, the same LAS assigned to process a particular request will also handle the review of records referred by other DOJ components or government agencies. By ensuring continuity in the processing of FOIA

-12-

requests, this system is not only fair to all persons seeking information under the FOIA, but is

also administratively efficient, since the same issues presented by the referred records will

already have been addressed by the LAS in processing the responsive FBI files.

### CHRONOLOGY OF PLAINTIFF'S FOIA REQUESTS

(18)   On or about October 28, 2002, FBIHQ received an undated FOIA/Privacy Act

request from plaintiff for the following records:

> The records sought are, but not limited to (1) arrest reports, (2)
> Task Force investigation reports, (3) reports of evidentiary and or
> scientific informational findings, (4) Final and closing
> investigation reports, (5) And any or all information data or
> reports, including surveillance, and all information or data not
> otherwise exempted by statue. **(See Exhibit A).**

(19)   FBIHQ acknowledged receipt of this request by letter dated November 1, 2002,

and assigned it FOIPA number 969183.  **(See Exhibit B).**

(20)   By letter dated February 24, 2003, FBIHQ advised plaintiff that although a search

of the Central Records System ("CRS") located documents that may be responsive to his request,

the FBI was unable to locate that file.  FBIHQ informed plaintiff that the file would be placed on

"Special Locate"[6] and that once it was located he would be notified. **(See Exhibit C.)**  The file

that was identified as a result of that search was file 281F-CE-60393.

(21)   Plaintiff filed an administrative appeal from the FBI's action on his request with

the U.S. Department of Justice, Office of Information and Privacy ("OIP") by letter dated March

10, 2003.  **(See Exhibit D.)**

---

[6] A file is placed on "Special Locate" when it cannot be located after an initial search by
the record custodian.  The record custodian then will conduct a more expansive search.

(22)   OIP acknowledged receipt of plaintiff's administrative appeal by letter dated April 3, 2003, and assigned it appeal number 03-1752. (**See Exhibit E.**)

(23)   By letter dated December 15, 2003, OIP affirmed the FBI's action on plaintiff's request and advised him that he must write directly to all of the FBI field offices that he believes maintains material responsive to his request. (**See Exhibit F.**)

(24)   Plaintiff submitted another request, dated May 17, 2004, for essentially the same records to the Charlotte Field Office ("CEFO") of the FBI. (**See Exhibit G.**)

(25)   The CEFO forwarded this request to FBIHQ, and it's receipt at FBIHQ was acknowledged by letter dated June 9, 2004. FBIHQ assigned FOIPA number 999289 to this request. (**See Exhibit H.**)

(26)   After conducting a search of the CRS for records responsive to plaintiff's May 17 request, FBIHQ located file 281F-CE-60393, the same file that was identified in 2002 but was not located.

(27)   The FBI's Negotiation Team is utilized when records potentially responsive to a request total more than 2,500 pages. Such a large request is placed in the large queue of the FBI's multi-track processing system.[7] The goal of the Negotiation Team is to provide enough

---

[7] The FBI uses a three-queue system as a way to perfect and assign new requests. The three-queue system established "multi-track" processing for requests, based on the amount of time and work involved in handling a particular request. The system nevertheless preserves the principle that, within the three queues, requests are still assigned and processed on a first-in/first out basis. The placement of a request in one of the three queues depends on the total amount of material responsive to that request -- 500 pages or less ("small queue"), 501 to 2,500 pages ("medium queue"), or more than 2,500 pages ("large queue"). This standard operating procedure, coupled with the FBI's "first in/first out" policy, permits requests to be addressed in the order in which they are received, while obviating the inequities to other requesters whose interests relate

information to a requester to enable them to make informed decisions to narrow the scope of the request in effort to speed processing of the request and also reduce applicable processing fees. In order to provide the requester with enough information upon which to base their decision to narrow the scope of the request, the Negotiation Team analyst must review all of the responsive records in order in order to be able to explain in detail the type of material contained in each file.

(28)    In this case, the Negotiation Team was assigned to handle plaintiff's request because the files responsive to this request totaled more than 2,500 pages of material; and therefore, was placed in the large processing queue. Plaintiff's request was assigned to the Negotiation Team on August 6, 2004. By letter dated January 12, 2005, the Negotiation Team advised plaintiff of the results of its review of the material responsive to his request and requested that he consider narrowing the scope of his request on the basis of the information provided regarding the contents of each file. (**See Exhibit I.**) At this time, FBIHQ has no record of receiving a response from plaintiff with regard to this letter.

### EXPLANATION OF THE FBI'S CENTRAL RECORDS SYSTEM

(29)    The CRS, which is utilized by the FBI to conduct searches in response to FOIA and Privacy Act requests, enables it to maintain all information which it has acquired in the course of fulfilling its mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual,

only to a small number of documents.

organization, company, publication, activity, or foreign intelligence matter.  Certain records in

the CRS are maintained at FBIHQ.  Records that are pertinent to specific field offices of the FBI

are maintained in those field offices.

(30)    Access to the CRS is obtained through the General Indices, which are arranged in

alphabetical order.  The General Indices consist of index cards on various subject matters that are

searched either manually or through the automated indices.  The entries in the General Indices

fall into two categories:

> (a) A "main" entry -- A "main" entry, or "main" file, carries the name
> corresponding with a subject of a file contained in the CRS.
>
> (b) A "reference" entry --"Reference" entries, sometimes called "cross-
> references," are generally only a mere mention or reference to an individual,
> organization, or other subject matter, contained in a document located in another
> "main" file on a different subject matter.

(31)    Access to the CRS files in FBI field offices is also obtained through the General

Indices (automated and manual), which are likewise arranged in alphabetical order, and consist

of an index on various subjects, including the names of individuals and organizations.  Searches

made in the General Indices to locate records concerning a particular subject, such as Jill

Holland, are made by searching the subject requested in the index.  FBI field offices have

automated indexing functions.

(32)    On or about October 16, 1995, the Automated Case Support ("ACS") system was

implemented for all Field Offices, Legal Attaches ("Legats"), and FBIHQ.  Over 105 million

records were converted from automated systems previously utilized by the FBI.  ACS consists of

three integrated, yet separately functional, automated applications that support case management

functions for all FBI investigative and administrative cases:

(a) Investigative Case Management ("ICM") – ICM provides the ability to open, assign, and close investigative and administrative cases as well as set, assign, and track leads. The Office of Origin ("OO"), which sets leads for itself and other field offices, as needed, opens a case. The field offices that receive leads from the OO are referred to as Lead Offices ("LOs") – formerly known as Auxiliary Offices. When a case is opened, it is assigned a Universal Case File Number ("UCFN"), which is utilized by all FBI field offices, Legats, and FBIHQ that are conducting or assisting in the investigation. Using a fictitious file number "111-HQ-12345" as an example, an explanation of the UCFN is as follows: "111" indicates the classification for the specific type of investigation; "HQ" is the abbreviated form used for the OO of the investigation, which in this case is FBIHQ; and "12345" denotes the individual case file number for the particular investigation.

(b) Electronic Case File ("ECF") – ECF serves as the central electronic repository for the FBI's official text-based documents. ECF supports the universal serial concept, in that only the creator of a document serializes it into a file. This provides a single-source entry of serials into the computerized ECF system. All original serials are maintained in the OO case file.

(c) Universal Index ("UNI") – UNI continues the universal concepts of ACS by providing a complete subject/case index to all investigative and administrative cases. Only the OO is required to index; however, the LOs may index additional information as needed. UNI, an index of approximately 86.1 million records, functions to index names to cases, and to search names and cases for use in FBI investigations. Names of individuals or organizations are

recorded with identifying applicable information such as date or place of birth, race, sex, locality,

Social Security number, address, and/or date of event.

(33)    The decision to index names other than subjects, suspects, and victims is a

discretionary decision made by the FBI Special Agent ("SA") assigned to work on the

investigation, the Supervisory SA ("SSA") in the field office conducting the investigation, and

the SSA at FBIHQ.  The FBI does not index every name in its files; rather, it indexes only that

information considered to be pertinent, relevant, or essential for future retrieval.  Without a "key"

(index) to this enormous amount of data, information essential to ongoing investigations could

not be readily retrieved.  The FBI files would thus be merely archival in nature and could not be

effectively used to serve the mandated mission of the FBI, which is to investigate violations of

federal criminal statutes.  Therefore, the General Indices to the CRS files are the means by which

the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on

a particular subject matter or individual, i.e., Benjamin Shabazz Peay.

### SEARCH FOR RECORDS RESPONSIVE TO PLAINTIFF'(S)' REQUEST

(34)    In this case, the FBI has employed several mechanisms as part of its search efforts

to identify documents responsive to plaintiff's request.  Both the Automated Data Base ("ADB")

and the Inactive Indices of the CRS[8] at both FBIHQ and the Charlotte Field Office were searched

------

[8] As discussed earlier, the CRS enables the FBI to maintain all records which it has
generated or acquired in the course of fulfilling its mandated law enforcement responsibilities,
including both national security investigations and criminal investigations.  The ADB of the CRS
contains all records dated after January 1, 1958 for national security applicant, and administrative
matters, and after January 1, 1973 for criminal investigative matters.  The Inactive Indices of the
CRS contain all records dated prior to 1958 for national security matters and all records dated
prior to 1973 for criminal investigative matters.

for any records pertaining to Benjamin Shabazz Peay.

(35)    As a result of the FBI's search efforts, the following main files were located at

FBI Headquarters(HQ) and the Charlotte Field Office(FO): 281F-CE-60393 (HQ); 281F-CE-

60393 (FO); 281F-CE-60393 1A (FO); 281F-CE-60393 FUG (FO); 281F-CE-60393 SUB A

(FO); 281F-CE-60393 SUB B (FO); 281F-CE-60393 SUB C (FO); 281F-CE-60393 SUB D

(FO); 281F-CE-60393 SUB E (FO); 281-CE-60393 SUB F (FO); 281F-CE-60393 SUB G (FO);

281F-CE-60393 SUB H (FO)

(36)    The search for documents responsive to plaintiff's request for documents related

to himself has now been completed.  Approximately 2800 pages of material has been identified

as potentially responsive to plaintiff's request.

(37)    Based on the page count of approximately 2800 pages, plaintiff's request is

currently on the Negotiation Team, but will be placed in the large queue of the "perfected case"

backlog if plaintiff does not narrow his request by responding to the January 12 letter within 30

days.  As explained earlier, in order to ensure fairness to all requesters and to equitably

administer the deluge FOIA/Privacy Act requests received by the FBI, a request is assigned based

on the date of receipt on a "first in/first out" basis from within each of three queues according to

sound administrative practices.  Based on the date of this request-May 17, 2004- there are

approximately 29 requests pending ahead of plaintiff's request in the large queue, each totaling

more than 2,500 pages of material.  The FBI anticipates that the earliest plaintiff's request will be

assigned to the Disclosure Unit for processing is in thirteen (13) months; however, if plaintiff

decides to narrow the scope of his request the assignment of this case may be expedited.  In

addition, the FBI anticipates it will require approximately twelve (12) months for the responsive documents to be processed and released to plaintiff.

(38)    The FBI takes it responsibilities with regard to the administration of the FOIA/Privacy Act program very seriously, and all reasonable efforts are being made to comply with the statutory deadlines. Regrettably, compliance with these deadlines is often not possible. However, as explained supra, the FBI has made tremendous strides in reducing its backlog over time. This reduction has occurred even while thousands of new FOIA/Privacy Act requests have been received. Nevertheless, the most equitable way to reduce the backlog and ensure that each request receives the attention it deserves is to process these requests based on the date of receipt according to sound administrative practices as explained above. It would be unfair to assign plaintiffs' request for processing before other requesters whose requests were in the queue ahead of plaintiff. Each court order which requires that one request be given priority ahead of the others invariably works to the detriment of the other more patient requesters and encourages other requesters to seek relief in the courts, thereby undermining the FBI's attempt to manage the thousands of FOIA/Privacy Act requests it receives annually in a fair and consistent fashion.

(39)    For the above reasons, the FBI submits this declaration in support of its request in support of a stay of proceedings for twenty five (25) months, until February 28, 2007, in order to allow the FBI to complete the processing and release of those documents responsive to plaintiff's request.

-20-

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A through I attached hereto are true and correct copies.

Executed this ___27th___ day of January, 2005.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.